UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-MJ-2241-MBB |
| | ) | |
| | ) | |
| YSRAEL NUNEZ and | ) | |
| LEISY BAEZ-ZAPATA | ) | |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Jarred M. Matyka, being duly sworn, depose and state that:

### INTRODUCTION

1.      I am a Special Agent with the United States Immigration and Customs Enforcement, Homeland Security Investigations (HSI), and am currently assigned to the United States Drug Enforcement Administration (DEA) Manchester, New Hampshire District Office. Prior to my assignment with the DEA, I was assigned to the HSI Boston Gang Unit, as well as several investigative groups in HSI Newark, New Jersey, where I was responsible for conducting narcotics investigations.

2.      As an HSI Special Agent, I am authorized to investigate federal crimes, including violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have been a Special Agent with HSI for approximately thirteen years. In my investigative experience, I have conducted physical surveillance, executed search and arrest warrants, conducted interviews, and worked with cooperating individuals. As part of my training, I have graduated from the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program, as well as the HSI Special Agent Basic Training. In

1

addition, during my time as a criminal investigator, I have completed several in-service training courses focused on narcotics and gang investigations.

3.     During my employment with HSI, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, fentanyl, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.

4.     I submit this affidavit for three reasons. First, in support of an application for a criminal complaint charging that, from in or about October 2018 to the present, in Lawrence and elsewhere in the District of Massachusetts, Ysrael NUNEZ, aka "Juanito," (hereinafter, "NUNEZ") and Leisy BAEZ-ZAPATA (hereinafter, "BAEZ-ZAPATA"), and others yet unknown, conspired to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846; and charging that on or about July 25, 2019, BAEZ-ZAPATA distributed and possessed with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). Second, I submit this affidavit in support of an arrest warrant for NUNEZ. Third, I submit this affidavit in support of the government's motion that BAEZ-ZAPATA and NUNEZ (once he is arrested) be detained

2

pending trial.  Based on the information set out below, NUNEZ and BAEZ-ZAPATA represent a danger to the community and/or pose a significant flight risk.

5.  I have personally participated in the investigation of NUNEZ and BAEZ-ZAPATA as outlined in this affidavit.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

6.  This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and it does not set forth all of my knowledge about this matter.  I have set forth only those facts that I believe are necessary to establish probable cause that NUNEZ and BAEZ-ZAPATA violated 21 U.S.C. § 846, and that BAEZ-ZAPATA violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi).

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7.  In October 2018, investigators received information from a cooperating source ("CS-1") about NUNEZ.  CS-1 has cooperated with law enforcement since approximately January 12, 2016.  CS-1 is cooperating in exchange for monetary compensation.  CS-1 continues to cooperate with law enforcement on additional investigations.  The anonymity of CS-1 is necessary to protect such ongoing investigations.  CS-1 has a criminal history that includes a conviction for a controlled substance offense.  Some of the information provided by CS-1 has been independently corroborated by law enforcement.  I believe the information provided by CS-1 to be reliable.

8.  On October 26, 2018, CS-1 informed agents that he/she knows an individual who

goes by the name of "Juanito" through a mutual friend CS-1 knows as "cousin." CS-1 believes that "Juanito" is a part of a drug trafficking organization that supplies large amounts of illicit narcotics, including heroin and fentanyl, in the greater Lawrence, Massachusetts, area. CS-1 provided agents with a Facebook photograph of "Juanito." By conducting searches in law enforcement databases, investigators were able to identify "Juanito" as matching the Massachusetts Driver's License photograph of Ysrael NUNEZ.

**Acquisition of Sample of Suspected Fentanyl – October 26, 2018**

9.      At approximately 5:19 p.m. on October 26, 2018, at the direction of investigators, CS-1 called NUNEZ to arrange obtaining a sample of fentanyl. The telephone conversation was recorded and preserved as evidence retained by the DEA. All recordings described herein were in Spanish.

10.      During the conversation with NUNEZ, CS-1 asked NUNEZ if he could go to the "tienda" (store) to retrieve what was arranged for with "cousin." CS-1 reported that the arrangement was for NUNEZ to provide a small sample amount of fentanyl to "cousin" as a precursor to future larger fentanyl sales at the "tienda," which is a reference to Carlos Multi-Services, located at 174 South Union Street, Lawrence, Massachusetts (hereinafter, the "tienda" or "Carlos Multi-Services").

11.      CS-1 advised investigators that he/she would pick up "cousin" (an unidentified Hispanic male) prior to meeting with NUNEZ. CS-1 explained that "cousin" was the individual orchestrating the encounter with NUNEZ at the behest of CS-1. According to CS-1, "cousin" would meet NUNEZ face to face and CS-1 would not.

4

12.     Before leaving the pre-determined location to pick up "cousin," investigators searched CS-1 and CS-1's vehicle (hereinafter, the "CS vehicle"), and found no contraband, money or weapons.  Investigators followed and observed CS-1 at all times during this operation.

13.     At approximately 5:39 p.m., CS-1 picked up an unidentified Hispanic male, described as 5 foot 8 inches tall, approximately 160 pounds, wearing a black hoodie, skinny jeans, and a black hat.  CS-1 later confirmed that the unidentified male is the individual CS-1 knows as "cousin."

14.     At approximately 5:50 p.m., CS-1 drove "cousin" to the vicinity of "cousin's" house in the area of Basswood Street, Lawrence, Massachusetts.  Shortly thereafter, "cousin" told CS-1 that NUNEZ would meet "cousin" at the "tienda" (Carlos Multi-Services) in approximately twenty minutes.  CS-1 drove "cousin" to 174 South Union Street in Lawrence.

15.     At approximately 6:30 p.m., investigators observed a Hispanic male believed to be NUNEZ in the area of 170-174 South Union Street.  CS-1 provided investigators NUNEZ's Massachusetts license plate number (i.e., 6XD944).  Investigators conducted a vehicle search of that license plate and learned that it is currently registered to NUNEZ, with a listed address of 7 Ferguson Street in Lawrence.  The registration is for a blue Acura MDX with vehicle identification number 2HNYD2H21CH534790.  Investigators observed the same vehicle parked in the area of surveillance.

16.     Just before 7:00 p.m., "cousin" went into Carlos Multi-Services to meet with NUNEZ to retrieve a sample of fentanyl, while CS-1 remained in the vehicle.

17.     At approximately 7:31 p.m., the transaction was complete.  CS-1 proceeded to drop off "cousin" in the area of Basswood Street in Lawrence.  Immediately thereafter, investigators

met with CS-1 at a predetermined location to debrief.

18.     CS-1 provided investigators with the sample of suspected fentanyl provided by NUNEZ, which consisted of two small packages wrapped in clear plastic containing a white powdery substance believed to be fentanyl weighing approximately three grams. According to CS-1, one of the plastic wrappings appeared to be pure and cut from a "brick" (meaning it was uncut/unadulterated fentanyl) and the other clear baggie appeared to contain adulterated ("cut" or diluted) fentanyl. I know from my training and experience that kilograms of fentanyl are often sold at the wholesale level as a compressed powder that is in the shape of a brick. Investigators conducted a search of CS-1 and the CS vehicle for contraband, weapons, or monies, and found none. CS-1 reported to investigators that NUNEZ arrived at Carlos Multi-Services in the blue Acura MDX and stayed with "cousin" inside the store. According to CS-1, NUNEZ telephonically called a "worker" to retrieve a sample for "cousin." CS-1 confirmed that the "worker" did not drive to the location, but walked, and that the "worker" was not present at the location when CS-1 and "cousin" arrived. CS-1 further advised that "cousin" told NUNEZ that "cousin" would pass the sample along to a prospective buyer.

19.     I believe the substance delivered by NUNEZ to be fentanyl based upon my training and experience, the appearance and packaging of the substance, and the background facts of this investigation. The suspected fentanyl was not field tested due to the airborne hazards of fentanyl and concerns for officer safety. Investigators submitted the suspected fentanyl to the DEA Northeast Regional Laboratory for analysis and testing. The results are pending.

**Second Acquisition of Sample Fentanyl and Introduction of CW-1 – December 1, 2018**

20.     On December 1, 2018, investigators arranged for the controlled meet and acquisition of a sample of suspected fentanyl from NUNEZ utilizing both CS-1 and a second cooperating individual who intends on testifying (hereinafter, "CW-1").

21.     CW-1 is a registered confidential informant with the DEA who has been working with the DEA since 2017.  Information provided by CW-1 related to other investigations has led to multiple arrests, seizures of narcotics, and convictions.  CW-1 has a criminal history that includes an arrest for a controlled substance offense that was dismissed in consideration for cooperation with law enforcement.  CW-1 is currently working for monetary compensation.  Some of the information provided by CW-1 has been independently corroborated by law enforcement.  I believe the information provided by CW-1 to be reliable.

22.     At the direction of investigators, CS-1 asked "cousin" to arrange for CS-1 and CW-1 to meet with NUNEZ.  According to CS-1, "cousin" reported that NUNEZ would meet CS-1 and CW-1 at the "tienda" on South Union Street between 5:00 p.m. and 6:00 p.m., but that NUNEZ would call "cousin" and tell "cousin" when CS-1 and CW-1 could enter the store.

23.     At approximately 5:30 p.m., investigators searched CS-1 and CW-1 and their vehicle for contraband, weapons, or monies, and found none.  Investigators supplied CW-1 with a monitoring device, so that investigators could monitor the transaction in real-time, as well as an audio-video recording device.  Investigators followed and observed CS-1 and CW-1 at all times during this operation.

24.     CS-1 reported that he/she received a call from "cousin" at approximately 6:40 p.m., during which "cousin" advised that CS-1 and CW-1 could enter the store, and that they should ask

for "Demonio" once inside.  At approximately 6:43 p.m., CW-1 entered Carlos-Multi Services
while CS-1 remained inside the vehicle.

25.     At approximately 6:45 p.m., investigators monitoring the transaction heard
someone ask CW-1 why CS-1 did not enter the store.  CW-1 was then told by an unknown
individual to wait outside the store.  Shortly thereafter, CS-1 received a call from "cousin" advising
that NUNEZ ("Juanito") was directing CW-1 back inside the store.  After being inside Carlos
Multi-Services for approximately five minutes, CW-1 exited the building and returned to the CS
vehicle.  As observed by investigators, CS-1 and CW-1 departed the area and proceeded to a
predetermined location to meet with investigators to debrief.  Investigators searched CS-1, CW-1,
and their vehicle for contraband, weapons, and monies, and found none.  CW-1 returned the
monitoring and recording device to investigators.  The recording was entered into DEA evidence.

26.     During the debrief, CW-1 reported that in order to enter Carlos Multi-Services,
CW-1 had to be "buzzed in" and that, after entering, the door was re-locked.  CW-1 reported to
investigators that the store did not seem to have any real merchandise and was not like a real store.
CW-1 described that inside the store was a glass window, and that there was a Hispanic male who
identified himself as "Demonio" behind the glass.  CW-1 reported that there were multiple cameras
inside the store.

27.     According to CW-1, "Demonio" asked CW-1 if CW-1 was a friend of CS-1, to
which CW-1 affirmed.  "Demonio" then asked about the whereabouts of CS-1, to which CW-1
responded that CS-1 was waiting outside.  CW-1 reported that "Demonio" then proceeded to open
a door located to the side of the glass window and let CW-1 enter.  After entering through the door,
it was closed behind CW-1.  In the room, CW-1 observed multiple Hispanic males who CW-1

noted appeared to be gambling. According to CW-1, other males not participating in the suspected gambling stood in various groups around the back wall of the room. Investigators showed CW-1 a picture of NUNEZ. CW-1 reported that he/she did not observe NUNEZ inside the store.

28.     CW-1 reported that he/she waited for "Demonio" to return to the room. "Demonio" went up to CW-1, lifted up one arm and passed the other arm underneath as to hide the transaction. As "Demonio" gave CW-1 the sample of suspected fentanyl, he told CW-1, "Tell Juanito (NUNEZ) he's a pain in my ass."

29.     CW-1 provided investigators with the sample of suspected fentanyl, which consisted of a white powdery substance believed to be fentanyl wrapped in clear plastic and weighing approximately 1.25 gross grams. The suspected fentanyl was not field tested due to the airborne hazards of fentanyl and concerns for officer safety. Investigators submitted the suspected fentanyl to the DEA Northeast Regional laboratory for analysis and testing. The results confirm the substance was 0.956 net grams of fentanyl.

### Controlled Purchase of Fentanyl – December 18, 2018

30.     On December 18, 2018, investigators arranged for CW-1 and a DEA undercover agent (hereinafter, "UC") to purchase fentanyl from NUNEZ. At approximately 3:03 p.m., at the direction of investigators, CW-1 called NUNEZ to discuss purchasing 25 grams of fentanyl. CW-1 and NUNEZ agreed to meet at approximately 4:00 p.m. at the same location as before (Carlos Multi-Services). Shortly thereafter, NUNEZ called CW-1 and tell CW-1 to start heading to the store. The calls were recorded and are in Spanish.

31.     At approximately 4:32 p.m., at the direction of investigators, CW-1 called NUNEZ

and stated that he/she would be leaving in fifteen minutes, and confirmed the meeting location. CW-1 agreed to call NUNEZ once CW-1 was outside the location. The call was recorded and in Spanish.

32.     Investigators searched CW-1 and CW-1's vehicle for contraband, weapons, or money, and found none. Investigators provided CW-1 with $1,500 in serialized government funds, as well as an audio-video recording device. The UC drove CW-1 to Carlos Multi-Services at 174 South Union Street. Surveillance teams monitored the entire operation.

33.     At approximately 4:50 p.m., NUNEZ called CW-1 and advised CW-1 to enter the store and ask for "Kiki," who would be wearing a "sombrero." The call was recorded and in Spanish. The UC observed CW-1 enter the store and then exit the store approximately two minutes later. CW-1 then entered the UC vehicle and transferred custody of the suspected fentanyl to the UC. The suspected fentanyl appeared to be a hard white powder wrapped in plastic. The hard white powder appeared to be solid, which through investigators collective training and experience appeared to have been cut off of a kilogram block or brick.

34.     Investigators surveilling the area around 174 South Union Street observed a Hispanic male wearing a straw hat/sombrero believed to be "Kiki" exit Carlos Multi-Services and enter 25 Bailey Street, Lawrence, Massachusetts. Surveillance of 174 South Union Street subsequently terminated.

35.     At approximately 5:01 p.m., NUNEZ called CW-1, and asked CW-1 if he/she was okay. The call was recorded and in Spanish. Based on investigators collective training and experience, investigators believe that NUNEZ was calling to make sure that CW-1 made it out of the area without any law enforcement contact. During that call, NUNEZ also advised CW-1 to

contact him when CW-1 was ready to meet for further transactions.

36.     At approximately 5:05 p.m., CW-1 and the UC met with additional investigators to debrief.  CW-1 and the vehicle were searched for additional contraband, weapons, or monies, with negative results.   CW-1 provided investigators with the audio-video recording device. Investigators did not field test the suspected fentanyl due to the airborne hazards of fentanyl and concerns for officer safety.  Investigators submitted the suspected fentanyl to the DEA Northeast Regional laboratory for analysis and testing.  The results confirm the substance was fentanyl, with a net weight of 24.9 grams.

## Additional Contact with NUNEZ

37.     On January 22, 2019, CW-1 received a phone call from NUNEZ.  The call was recorded and in Spanish.  CW-1 played the call for investigators and explained the conversation as we listened to the recording.  During the call, CW-1 told NUNEZ that he/she was ready to do something (a transaction).  CW-1 told NUNEZ that he/she needed a good price and if the price is good CW-1 can buy more.  NUNEZ replied by saying "55," which CW-1 understood to mean $55 per gram.  CW-1 continued to negotiate and asked NUNEZ if he realized that CW-1 would be buying "whole ones" (meaning kilogram quantities).  NUNEZ recalled that CW-1 was the individual that NUNEZ gave "25 pesos" to, which investigators understood to mean the 25 grams of fentanyl NUNEZ sold to CW-1 on December 18, 2018.  CW-1 told NUNEZ that "if the price was right, you know… but I don't know how much you can do."  CW-1 explained that he/she was asking NUNEZ the amount of fentanyl he could sell to CW-1.  NUNEZ responded by saying that he would call back.

38.     At approximately 6:03 p.m., NUNEZ called CW-1 back on the same recorded line.

Investigators reviewed the recording with CW-1, who explained the conversation. During the call,

NUNEZ stated "she's 45 years old," which CW-1 explained meant that the fentanyl would cost

$45,000 per kilogram. CW-1 confirmed the price and then asked NUNEZ "but you can do six or

seven of these people?" CW-1 explained to investigators that "these people" referred to kilograms

of fentanyl. NUNEZ responded to CW-1 confirming the price, depending on how CW-1 planned

on paying. CW-1 responded stating that CW-1 would get the money together and call NUNEZ

back on Sunday (January 27, 2019), but that CW-1 wanted to do the transaction on Monday

(January 28, 2019) or Tuesday (January 29, 2019).

39.     On January 28, 2019, at the direction of investigators, CW-1 called NUNEZ to

arrange to purchase fentanyl. The call was recorded and in Spanish. CW-1 reviewed the call and

explained it to investigators. During the call, CW-1 told NUNEZ that CW-1 had been trying to

get ahold of NUNEZ but his phone was off. CW-1 also stated that CW-1 was attempting to get

together with "8 of those girls." CW-1 explained that "girls" was street terminology used to refer

to kilograms of fentanyl. The two agreed to the previously agreed upon price, however, NUNEZ

seemed a bit confused about the quantity and whether CW-1 wanted grams or kilograms. CW-1

replied that he/she wanted "complete" meaning kilograms, and NUNEZ asked CW-1 how much

money CW-1 had on hand. NUNEZ told CW-1 that he needed to see the money beforehand, and

CW-1 responded that CW-1 wanted to see the product first. NUNEZ would not agree to that, but

stated that he would check with his boss and call CW-1 back.

40.     On February 6 and 7, 2019, at the direction of investigators, CW-1 attempted to call

NUNEZ a number of times, but each time it went directly to voicemail. On February 7, 2019, at

approximately 1:00 p.m., at the direction of investigators, CW-1 went to Carlos Multi Services and asked two unknown males if CW-1 could speak with NUNEZ ("Juanito") or "Demonio." Prior to going to Carlos Multi Services, investigators searched CW-1 for money or contraband and none was found. CW-1 reported to investigators that, once inside the store, CW-1 was told by these unknown males that neither "Juanito" nor "Demonio" were there, but that "Demonio" would be back at the store later that day. CW-1 left the store and returned to meet with investigators, who searched CW-1 for money or contraband, and none were found.

41.     At approximately 3:17 p.m., at the instruction of investigators, CW-1 to returned to Carlos Multi Services, left CW-1's telephone number with the two unidentified males, and told them that CW-1 needed to speak with "Juanito" or "Demonio."

42.     At approximately 3:55 p.m., CW-1 received two phone calls from an unknown number. At the direction of investigators, CW-1 called the number back and, according to CW-1, NUNEZ answered the call. The call was recorded and in Spanish. Following the call, CW-1 described the discussion to investigators. During the call, CW-1 asked NUNEZ when they could meet and if they could meet "now." NUNEZ responded that he was "doing something." CW-1 told NUNEZ that CW-1 called NUNEZ numerous times and NUNEZ didn't answer. NUNEZ told CW-1 that he changed his number. NUNEZ asked CW-1 if CW-1 could meet at "Blue," referring to Club Blue located at 2 Amesbury Street, in Lawrence, Massachusetts. During the call, CW-1 told NUNEZ that CW-1 would check his/her schedule to see if CW-1 could go that night. CW-1 told investigators that "Club Blue" is a restaurant by day and a nightclub at night.

## Controlled Purchase of Suspected Fentanyl – July 24, 2019

43.     On July 24, 2019, investigators arranged for CW-1 to purchase fentanyl from NUNEZ. At approximately 10:16 p.m., at the direction of investigators, CW-1 called NUNEZ to discuss purchasing 25 grams of fentanyl. CW-1 and NUNEZ agreed that CW-1 and CS-1 would meet NUNEZ at Club Blue. The call was recorded and in Spanish.

44.     Investigators searched CW-1 and CS-1, as well as their vehicle (hereinafter, the "CS vehicle") for contraband, weapons, or money, and found none. Investigators provided CW-1 with $1,500 in serialized government funds, as well as an audio recording device.    At approximately 10:35 p.m., CS-1 and CW-1 drove to Club Blue located at 2 Amesbury Street in Lawrence.   Investigators also established surveillance in the area of Amesbury Street.    At approximately 10:55 p.m., CS-1 and CW-1 arrived in the parking lot adjacent to Club Blue. Shortly thereafter, investigators observed NUNEZ speak with CS-1 and CW-1 outside the CS vehicle for a short period of time, then enter the CS vehicle, remain inside for approximately three minutes, then exit the CS vehicle and walk back to Club Blue.

45.     CW-1 and CS-1 drove to a predetermined location to meet with investigators to debrief. CW-1 provided investigators with the audio recording device, as well as the 25 grams of suspected fentanyl. I believe the substance delivered by NUNEZ to be fentanyl based upon my training and experience, the appearance and packaging of the substance, and the background facts of this investigation.   Investigators searched CW-1, CS-1, and the CS vehicle for additional contraband, weapons, or monies, with negative results.   Investigators did not field test the suspected fentanyl purchased from NUNEZ due to the airborne hazards of fentanyl and concerns for officer safety. Investigators submitted the suspected fentanyl to the DEA Northeast Regional

14

laboratory for analysis and testing.  The results are pending.

46.      During the debrief, CW-1 told investigators that when NUNEZ first approached the CS vehicle they had a discussion about how much "cut" they could add to each gram of fentanyl supplied by NUNEZ.  They discussed that CW-1 could add seven grams of cut for every gram of fentanyl.  CW-1 told investigators that CW-1 then handed NUNEZ the $1,500, and that NUNEZ counted the money, then got into the backseat of the CS vehicle.  CW-1 reported that NUNEZ then placed the 25 grams of suspected fentanyl on CW-1's lap.  NUNEZ told CW-1 to call him the next day to order a larger quantity if CW-1 liked the quality of the product.

**Controlled Purchase of Suspected Fentanyl and Arrest of BAEZ-ZAPATA – July 25, 2019**

47.      Only July 25, 2019, beginning at approximately 2:19 p.m., at the direction of investigators, CW-1 spoke NUNEZ multiple times via telephone to arrange for a controlled purchase of a kilogram of suspected fentanyl.  The calls were recorded and in Spanish.  Initially CW-1 and NUNEZ agreed to meet at 121 Abbott Street in Lawrence.  Agents established surveillance in the area.  Investigators searched CW-1 and CW-1's vehicle for contraband, weapons, or money, and found none.  Investigators provided CW-1 with an audio-video recording device.  The UC drove CW-1 to the prearranged meeting location in an unmarked government vehicle (hereinafter, "UC vehicle").  While in route, CW-1 received a call from NUNEZ redirecting CW-1 to go to 191 Abbott Street. As the UC turned from South Union Street onto Abbott Street, the UC and CW-1 observed NUNEZ on the phone on the corner.  The UC parked near 191 Abbott Street.  Shortly thereafter, NUNEZ called CW-1 and directed CW-1 to go closer to 191 Abbott Street.  The UC drove around the block, and then dove back to 191 and parked the

15

vehicle.  A few moments later, an unknown male slowly rode a bicycle past the UC vehicle and looked inside.  Shortly thereafter, NUNEZ called CW-1 and asked if anyone else was in the car.  When CW-1 responded "yes," NUNEZ told CW-1 to go to 121 Abbott Street.  The UC then drove to 121 Abbott Street.  Moments after arriving at 121 Abbott Street, BAEZ-ZAPATA walked up to the UC vehicle and got in the back seat.  Once inside the UC vehicle, BAEZ-ZAPATA handed a bag to CW-1.  Inside the bag was an off-white powdery substance firmly packed in the shape of a ball approximately the size of a softball.  The ball of powder was wrapped in clear plastic wrap.  CW-1 asked if it was "loose," and BAEZ-ZAPATA said it was not.  CW-1 told BAEZ-ZAPATA that they would get the money, at which point the UC popped open the trunk, which was the signal to investigators to approach.  Investigators then placed BAEZ-ZAPATA under arrest without incident.

48.     CW-1 provided investigators with the audio-video recording device.  Investigators did not field test the suspected fentanyl due to the airborne hazards of fentanyl and concerns for officer safety.  I believe the substance delivered by NUNEZ to be fentanyl based upon my training and experience, the appearance and packaging of the substance, and the background facts of this investigation.    The suspected fentanyl weighed approximately 1.150 gross kilograms. Investigators will submit the suspected fentanyl to the DEA Northeast Regional laboratory for analysis and testing.

## CONCLUSION

49.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that, from in or about October 2018 to the present,

in Lawrence and elsewhere in the District of Massachusetts, NUNEZ, BAEZ-ZAPATA, and others yet unknown, conspired to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846. There is further probable cause to believe that BAEZ-ZAPATA distributed and possessed with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). I respectfully request, that the Court issue an arrest warrant for NUNEZ and that NUNEZ and BAEZ-ZAPATA be detained pending trial.

Jarred M. Matyka
HSI Special Agent

Sworn before me this 26 day of July 2019.

HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

17